2026 IL App (2d) 250045-U
No. 2-25-0045
Order filed May 26, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v. ZAVIAN D. WELLS, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable Victoria A. Rossetti, Judge, Presiding.
No. 18-CF-647

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Trial counsel was not ineffective for failing to (a) request a *Frye* hearing on the admission of firearms identification and comparison testimony, where the general acceptance of such testimony is not unsettled; (b) object to the firearms expert's opinion for lack of foundation, where he testified about his background and his assessment of the evidence; and (c) meaningfully cross-examine the expert, where the issue of the reliability of firearms identification testimony is settled and counsel's questioning was not deficient.  (2) Even if the admission of testimony relating to a license plate was erroneous, any error was harmless.  (3) The trial court did not err in denying defendant's motion to suppress a witness's identification of defendant, where the pretrial identification was not impermissibly suggestive and the evidence showed that the identification was based on the witness's independent recollection.  Affirmed.

¶ 2    Following a jury trial, defendant, Zavian D. Wells, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2022)) and two counts of attempt first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)).  He was sentenced to consecutive prison terms of 50 years for murder and

20 years for one of the attempt murder convictions, and he was sentenced to 12 years' imprisonment for the second attempt murder conviction, to be served concurrently. Defendant appeals, arguing that (1) trial counsel was ineffective for failing to (a) request a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) on the admission of firearms identification and comparison testimony, (b) object, for lack of foundation, to the admission of the firearms analyst's opinion, and (c) subject the analyst to meaningful cross-examination; and (2) he is entitled to a new trial, where the court's rulings, taken either individually or cumulatively, allowed (a) testimonial hearsay evidence generated by a forensics lab concerning a license plate number, and (b) an identification of defendant by a witness who did not have an adequate and ample opportunity to view the offense. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      The State's theory of the case was that defendant and another man entered a Zion apartment on February 16, 2018, at around 1:30 p.m., looking for money. The apartment belonged to Tasha Davis and Kaleah Beville, who were home at that time. Darius Glover (Tasha's son) sometimes stayed at the apartment and was there that day, as was his girlfriend, Marquitta Kidd. Defendant and the other man, who was never identified, found Glover's gold watch and took it. As defendant was leaving the apartment, he stood in the doorway and shot Tasha, Glover, and Beville. Beville was shot five times and died from the gunshot wounds.

¶ 5      Glover had received an insurance settlement and posted on social media a video of himself with cash. On the evening before the shooting, Glover was with several individuals, who, according to the State, decided to rob him. They enlisted Tracy Davis's help. They hit Glover, who escaped to his mother's apartment and hid there. On February 16, the individuals enlisted the help of two others, one of which was defendant. The State further alleged that the two women in

the Zion apartment later identified defendant and that neighbors stated that the men left the apartment in a white sedan (subsequently identified from surveillance video as a white Chevy Impala). Police were able to home in on the license plate, which was a Missouri plate registered to defendant. Police arrested defendant and searched his home, where they located Glover's stolen watch.

¶ 6 During a phone call defendant made from the Lake County jail, he asked a woman if she watered the plants, told her not to be alarmed by what she found, and noted that someone would come to pick it up. At her house, the police located a firearm among some fake plants. The firearm had defendant's fingerprints and DNA on it and was the murder weapon, according to the State. The firearm was purchased by defendant's girlfriend in Missouri.

¶ 7 The State also argued that cell phone data, including historical cell site analysis, tied defendant and Tracy (who allegedly was at the scene but did not enter the apartment) to the incident, as well as text messages. Tracy was on a phone call to someone housed in the Department of Corrections, and a recording of the call, which occurred during and after the shooting, reflected that defendant got into a car with Tracy after the shooting and stated that he had to "clap," *i.e.*, shoot, all three of the individuals, because they saw him.

¶ 8 Trial counsel argued that Glover's description of the shooter did not match defendant, and he told his mother (soon after the shooting), police, and investigators that one of the individuals was "Trigga," whom counsel argued should have been on trial. Counsel also argued that the description of one of the individuals who came to the apartment that was provided by the other occupants did not match defendant. Further, counsel noted that the individuals who entered the apartment stated that you knew we would be back.

¶ 9 A. Motion to Suppress Identifications

¶ 10     On February 22, 2023, defendant moved to suppress two photo identifications of him made by Tasha and Marquitta Kidd, arguing that investigators obtained the identifications by using unduly suggestive procedures and in violation of statutory requirements. 725 ILCS 5/107A-2 (West 2022). Defendant argued that each witness received two sets of properly administered photo lineups followed by a third improperly administered lineup. Thus, the identifications should have been suppressed.

¶ 11     The officer who administered the two lineups to Tasha on February 21, 2018, was not involved in the investigation. He administered two photo lineups through a computer program. Defendant's photo was included in the lineups. Initially, Tasha did not make an identification. Afterward, investigator Paul Kehrli, who was involved in the investigation, walked into the room and asked Tasha if there was anyone she thought "maybe" about. Tasha told him that the person in position two or three in the first lineup looked familiar but he looked "fatter." Kehrli did not know which position defendant was placed in the photo lineup. He printed a copy of one of the computer lineups and showed it to Tasha, and she identified the person in position four, who was defendant. She wrote that he looked like the "scruffy" shooter but that his face looked fatter.

¶ 12     Detective Michael Bush testified that he assembled a six-person photo lineup and gave it to an independent administrator to show to Tasha. Bush did not know where in the lineup defendant's photo was placed. Afterward, Kehrli notified Bush that Tasha stated she recognized someone from the lineup. The detectives never indicated to Tasha who she should pick. She circled defendant's photo.

¶ 13     Next, detective Traci Pugliese testified that she assembled two photo lineups for Kidd. An independent administrator showed Kidd the lineups (which each contained six photos) on a laptop on February 20, 2018. Kidd did not identify anyone in the computer lineups. Afterwards, when

Pugliese entered the room, Kidd stated that one of the individuals in the lineup looked familiar, specifically, the individual in position four. Pugliese did not know who was in position four. When asked why, Kidd explained that the person was the one rummaging through the apartment during the incident. Pugliese printed a copy of one of the computer lineups, and Kidd identified defendant, who was in position four. Pugliese further testified that, after the computer lineups were administered, detectives Bush and Pugliese entered the room where Kidd was seated, and Kidd stated, in reference to the second lineup, that one person in that lineup looked familiar, that the face looked like one of the boys she saw. Pugliese exited the room. When she returned, Bush stated that Kidd had stated that, on the day of the incident, the man wore a hat and stated, "I'm gonna kill your mama." Kidd pointed to one of the photos and stated that the man looked different without the hat and stuff on.

¶ 14    Previously, on February 16, 2018, Kidd stated that she did not get a good look at the men who entered the apartment and did not see the face of one of them at all. She also stated that the offenders wore gray hoodies and black hats ("Scullys," *i.e.,* beanies) but that she got a look at the eyes of second one (*i.e.*, the one rummaging in the room). She could not recall if they had facial hair, and both were taller than Kidd, who was 5 feet 9 inches tall. Kidd also stated that both men had guns. This was the extent of her description of the men on February 16. On February 20, 2018, Kidd wrote on the lineup photo, "I really can't say it's him, but the face just looks like one of the boys."

¶ 15    Next, detective Bush testified that he also participated in the post-administration interview with Kidd, after she stated that there was someone in the lineup that she had seen before. Explaining a video of the interview, Bush stated, "You see when Detective Pugliese and I walk in Miss Kidd immediately starts telling us that[,] in the second lineup, you know, that subject number

four looked familiar like she says 'one of those boys' I think she says that was involved in the incident." She remembered the face of one of the men who entered the apartment, referring to the person in position four in the second lineup. At this point, Bush was unaware which individual was in position four in the lineup. He had not printed out the photo lineup at this time. Kidd stated that the man's eyes and face looked familiar. He wore a beanie during the incident. Later, Pugliese came back into the room with a printout, and Kidd "immediately" (as reflected in the video) pointed to number four. Kidd stated that the subject wore glasses that she did not believe were legitimate glasses that he needed to wear and were more of a disguise. He stated, according to Kidd, "where that shit at? I'm gonna kill your mamma."

¶ 16 The trial court denied defendant's motion. As to Kidd, it found that, even though Kidd did not identify someone from the photo array, when the detective entered the interview room "she is the one who said immediately one of them looks familiar." The court determined that the detective did not ask any suggestive questions that "would indicate who it was, the facial description of the person," but, rather, asked follow-up questions. Kidd described what she saw in the apartment during the incident and stated, "it looks like the guy." The court found that the State had met its burden to show Kidd identified defendant based on her independent recollection of the incident and that the procedure employed by the detectives was not unnecessarily suggestive as to create a substantial likelihood of misidentification.

¶ 17 As to Tasha, the court similarly found that, after she reviewed the second lineup, she told the officers that one face looked familiar but it was "fatter." When the detectives obtained a printout of the lineup, Tasha "immediately" identified the person in position four as the shooter. The State, the court determined, had met its burden as to Tasha's identification of defendant, it was

based on her independent recollection, and the procedures used were not unnecessarily suggestive to create a substantial likelihood of misidentification.

¶ 18    On appeal, defendant challenges only the identification by Kidd.

¶ 19                                B. Trial

¶ 20    A 911 call was placed at 1:38 p.m. on February 16, 2018, concerning a shooting at 2816 Edina Boulevard in Zion (the Zion apartment).

¶ 21                            1. Darius Glover

¶ 22    Darius Glover testified that, in February 2018, he did not have a permanent place to live and sometimes stayed with Tasha (his mother) and Kaleah Beville at their apartment in Zion. On about February 15, 2018, Glover received an insurance settlement of between $10,000 and $20,000. He bought a Michael Kors watch. Glover also videotaped himself with the money and posted it on Snapchat.

¶ 23    On February 15, 2018, Glover was hanging out with associates at Jerald "Lord" Hodges's house at 1801 Glenn in North Chicago. Also present was Hodges, a man named Trigga, James Towns, and Reese (Hodges's girlfriend). Outside the residence, the men had a disagreement, and Trigga struck Glover with a gun, knocking out some of his teeth. (Glover knew that the gun did not work.) Hodges also had a gun. Hodges and Trigga took $500 from Glover, along with his car (and keys, which also contained a key for the Zion apartment, and one or two cell phones). They asked Glover where he stored his money and then directed him into the house, threatening to kill him if he did not go in. Glover denied that he had the money on him, and the men stated that they had seen it on the video. Glover then told the men that the money was at the Zion apartment. Hodges and Glover drove to the apartment, with Trigga following in his own car (a 2006 or 2007 Chevy Impala that might have been light-colored, though, in a video, Glover stated it was grayish

- 7 -

brownish), and Glover and Hodges walked into the apartment. After a while, Glover told Hodges to leave and he did so.

¶ 24    Glover described Trigga as being 5 feet 10 inches to 6 feet tall and about 150 to 160 pounds. He was skinny and dark skinned (not as dark as Glover but not as light as Tasha). Trigga had a short haircut close to the scalp and scruffy facial hair on his cheeks. He wore a gray zipped hoodie in North Chicago. (Defendant is 6 feet 1 inch tall and weighed 185 pounds around the time of the incident.)

¶ 25    On February 16, 2018, Beville changed the Zion apartment's locks. That afternoon, Glover walked into his bathroom to take a shower and heard a lot of noise. When he opened the door, he saw a man with a gun, who told him to come out of the bathroom. Glover closed the door, and the man shot through the door, striking Glover's left shoulder. The man entered the bathroom and asked Glover where the money was and threatened his life.

¶ 26    That day, Kidd, whom Glover was dating, was also at the apartment. Glover did not see where she was when he exited the bathroom. The man who shot him in the shoulder rummaged through the bedroom. Glover then heard another man's voice and saw him pointing a gun at Tasha. The men were in Tasha's bedroom with Tasha. At this point, Beville was on the floor in the kitchen. The man who was in the room with Tasha then came to where Glover stood. The other man stated that they needed to leave. The man near Glover asked where the money was. When Glover replied that there was no money in the apartment, the man shot him in the leg (this man was not the same man as the one who first shot him). The man who shot him the first time left, and the second man walked to the door, turned around, and started shooting. After the men left, Kidd came out of Glover's bedroom closet and called the police. After a while, Beville did not respond when Glover checked on her.

¶ 27    Glover described the men as having dark black skin and looking alike. One wore disguise glasses. One man had a gun with an extended clip, and the other man had a gun with a green laser sight. Glover could not recall if, after the police arrived, he told them that it was Trigga who came in. Glover testified that he had never met the men who came to the Zion apartment. Glover mentioned Trigga to police when discussing the North Chicago incident.

¶ 28    Two days after the shooting, Glover was shown photographs by the police and identified Trigga. When asked if Trigga was one of the men who came into the apartment, Glover testified, "I don't know if it was him that came in, but one of the people that was in there looked like him." Trigga and one of the men involved in the shooting looked alike. The men were black and skinny. Glover believed that the North Chicago incident was related to the Zion shooting.

¶ 29    On cross-examination, Glover testified that he had heard noise in the kitchen during the incident in Zion, and someone yelled, "where is the shit" at, which means "where is the money." He also heard someone say, "I told you I would be back."

¶ 30    The person who shot Glover in the shoulder was black, about 5 feet 8 inches tall, about 215 to 220 pounds, and did not have a skinny face. He wore glasses. Glover told police that the man wore a black Nike hoodie, black pants, and a baseball hat. Glover gave the men his gold watch and a necklace.

¶ 31    The other man was dark skinned, 5 feet 10 inches tall, 150 to 160 pounds, and skinny. He had a short haircut, close the scalp. He resembled Trigga. Glover "maybe" told Tasha that the man was Trigga. When the police arrived at the Zion apartment, Glover told them that he did not know one of the men, but the other shooter was Trigga, but also asserted that he told police it could have been Trigga or someone that looked just like him. They "look[ed] just alike." The man wore black or navy jeans and a gray hoodie under a Columbia jacket. Glover testified that defendant

was not the man with glasses or Trigga. Defendant was 100 pounds heavier at trial; he looked like Trigga when he weighed less in 2018. In reviewing the police lineup, Glover told police that two of the men looked like Trigga.

¶ 32                                    2. Tasha Davis

¶ 33    Tasha, Glover's mother, testified that, around midnight on February 16, 2018, Glover arrived at her apartment with Hodges. Glover had his teeth knocked out, and he was bloody. When she asked what happened, neither Glover nor Hodges responded. Later, Hodges left.

¶ 34    In the morning, Kidd arrived at the apartment. She was dating Glover. At about 1:30 p.m., while Beville was getting ready to change the locks to the apartment, two men with guns stormed in (the door was open). Tasha had never seen the men before. Tasha and Beville were in the kitchen, Glover was in the washroom, and Kidd was in the bedroom.

¶ 35    Tasha testified that one of the men, defendant, was scruffy, had hair on his face, was skinny, and had a short haircut. The other man was dark-skinned, clean-shaven, wore glasses, and was husky. Both men had large guns with laser sights on the end, one red and one green. They were not handguns, but looked like machine guns. The men were the same height, about 5 feet 7 inches tall.

¶ 36    When the men entered the apartment, they told everyone to get down, and defendant stated, "You all know what this is. You all knew we were coming back."[1] Glover peaked out his head from the bathroom, and the men shot at the door. Glover was shot, and the men pulled him out of the bathroom, stating "Where is the money? Where is the money?" Defendant put a gun to Tasha's head, stating, "Tell me where the money is before I blow your mom's head off." Tasha was sitting

---

[1]This differs from Glover's testimony that one of the men stated, "I told you I would be back."

- 10 -

between the kitchen and bedroom. Defendant then walked toward Glover, who asked to make a phone call. The other man (*i.e.*, the man who wore glasses) tore up the house and then stated that they had been there too long and had to get out of there. He left the apartment.

¶ 37 The other man, whom Tasha stated was defendant, headed toward the door, turned around, and shot several times. Tasha was hit in her right arm, and Beville was also shot. The men spent about 30 minutes in the apartment. After the men left, Tasha instructed Kidd to call the police.

¶ 38 On February 21, 2018, Tasha gave a statement to the police and reviewed two photo lineups. Afterward, investigator Kehrli came into the room and asked her if she recognized anyone in the lineups, and she shook her head no. Kehrli then asked if she saw anyone "that you thought maybe?" Tasha stated that, in the first lineup, she thought defendant was the shooter, but his face looked fatter in the photo. She did not identify him during the computer photo lineup because she did not want to make a mistake. The investigator notified Tasha that the photo was not taken from the night of the incident. She circled and initialed the photo in position four. Tasha stated, "Because I'm not for sure, but he looks like, you know, he looks like the shooter."

¶ 39 Tasha further testified that, while waiting for the police to arrive, she and Glover spoke. Glover stated that he did not know one of the men, but the other person was Trigga. Tasha relayed this information to investigators at the hospital. Tasha further testified that the men who came to the house with guns on February 16, 2018, were not there the night before.

¶ 40 At the hospital, on February 17, Tasha reviewed another photo lineup. She identified a person on position five, Hodges, stating "I know this person," and identified him as being in the apartment the night before the shooting. Tasha also noted to position six, "Him too." When the computer program asked her to make an identification, Tasha typed in number five. The program would not let her enter a second number. She told the examiner that she wanted to choose six, too.

At the end of the program, it asked if she wanted to enter a comment, and Tasha entered a comment as to position six. The person in position six was *not* defendant. She identified position six as someone from the night before, not the day of the shooting. Tasha testified that she was wrong about the person in position six being at the apartment; he was just someone she had previously seen in the streets. She could not recall telling detective Bush that the person in position six looked similar to one of the men who came in during the shooting.

¶ 41                                    3. Marquitta Kidd

¶ 42    Kidd testified that, on February 16, 2018, she was dating Glover, and she was at the Zion apartment. In the early afternoon, Beville was changing the locks on the side door by the kitchen, and Kidd stood by the bedroom. Glover was in the shower, and Tasha was in the kitchen. Around 1:30 p.m., two men came into the house through the side door.

¶ 43    One of the men was darker, heavier, and wore glasses. The other man was taller, light-skinned, wore a hood or hat. Both men had guns. After they entered the apartment, they told the occupants to get down and not to move, and they looked for Glover. Kidd "was in the room—it's her bathroom where I was, and that's where [Glover] was in their bathroom, and I was right, like right there by the doorway on the floor."

¶ 44    When Glover tried to close the bathroom door, one man shot at him. One man stayed in the room, and the other man rummaged through the house. She stated, "I'm in a room so I really couldn't see, but I was hearing it." The men stated that they would kill Tasha if Glover did not tell them where the money was. Glover told the men that he had a watch and phone, but did not have any money. At one point, one of the men stated that they had been there too long and should leave. The men left, but Kidd heard around 10 gunshots, and she ran and hid in a closet. Kidd was not injured, but Glover, Tasha, and Beville were shot.

¶ 45    On February 20, 2018, Kidd reviewed a photo lineup. She did not identify a person during the computer lineup process. However, after detectives came in and asked her what happened, she identified defendant as the person who came in after the first man. She told police that she could not be certain ("I might be wrong") because the person had on a beanie and that, without the haircut, the face looked like one of the boys. (She wrote, "I really can[']t say it[']s him but the face just looks like one of the boys.") She stated that one of the offenders wore a gray hoodie.

¶ 46    Kidd testified that one of the men was taller (about 5 feet 10 inches) and skinny, and one was average height.

¶ 47                                4. Nettie Bea

¶ 48    Nettie Bea testified that, on the day of the incident, she lived above Tasha and Beville's apartment. Around 1:30 p.m., she heard a fight from downstairs and gunshots and went to her porch. She saw two black men running from the apartment and into a white car. During an interview, Bea stated that the car was a white 1996 Chevy Malibu.

¶ 49                                5. Ronald Steffke

¶ 50    Ronald Steffke lived down the street from Tasha and Beville, at 2810 Edina. On the day of the shooting, at around 1:30 p.m., Steffke saw two hooded males wearing dark clothes walk in front of his house. About 5 or 10 minutes later, he heard four or five gunshots. He saw one of the people from earlier enter a car, which left. The car was initially parked in front of his house and then moved in front of his neighbor's house. It was a white, four-door, mid-sized sedan with a damaged passenger-side rear bumper. He identified the vehicle in People's exhibit Nos. 96 and 97 (surveillance stills of an alley near the Zion apartment) as being the vehicle he observed.

¶ 51                                6. Detective Michael Bush

¶ 52    Detective Michael Bush testified that, on February 21, 2018, he constructed two lineups for Tasha. Each lineup consisted of six photos. Defendant was included in the lineup. The lineup was administered by an independent administrator, *i.e.*, a detective who was not involved in the investigation. A videotape of the administration of the lineup shows Tasha's body language change when she viewed the photo of the person in position four. She did not identify anyone during the computer lineup. Investigator Kehrli entered the room to speak with Tasha. Bush explained that no one was aware of the positions of the various photos in the lineups. Afterward, Kehrli retrieved a printout of the lineup, and he and Bush returned to the room and handed it to Tasha. She circled position four, who was defendant. Tasha wrote, "He looks like the shooter in this picture, his face just looks fatter."

¶ 53    That same day, a lineup was administered to Glover, but he did not make an identification. Defendant was in position two in the lineup. Also, Glover never picked out Trigga.

¶ 54    On February 20, 2018, Bush was involved with the administration of a lineup to Kidd, which was administered by an independent administrator. Kidd viewed two lineups, and defendant was placed in the second lineup. After she viewed the lineups, Kidd initiated a conversation, stating to detective Pugliese that one of the individuals looked like one of the men involved in the homicide. The detectives obtained a printout of the lineup, and Kidd stated that the person in position four in the second lineup—defendant—was one of the individuals involved in the incident. Kidd also stated that the man wore a beanie. She wrote on the printout, "Number four looks more like the second guy that came in behind the first guy. I really can't say it's him, but the face just looks like one of the boys." While writing, Kidd stated, "I might be wrong, but it just looks like him to me."

¶ 55    On February 17, 2018, at the hospital, Bush constructed a lineup that was administered by an independent administrator to Tasha. She identified Gerald Hodges in position five. Hodges was a suspect in the robbery. Tasha also made a comment about the individual in position six, stating that he could have been one of the people who was involved in the shooting. The person in position six was not defendant.

¶ 56                                    7. Michael Gardiner

¶ 57    Officer Michael Gardiner collected evidence from the Zion apartment. He found seven expended shell casings, and five projectiles (*i.e.*, bullets).

¶ 58                                    8. Dr. Kristin Alvarenga

¶ 59    Dr. Kristin Alvarenga performed the autopsy on Beville and testified that Beville had five gunshot wounds, with three having penetrated. Dr. Alvarenga recovered a bullet from the body. She concluded that Beville died due to multiple gunshot wounds that caused internal bleeding.

¶ 60                                    9. Matthew Ulanowski – License Plate

¶ 61    Matthew Ulanowski testified that he was an investigator on this case and conducted a neighborhood canvas. He found a nearby house equipped with a surveillance camera. On February 17, he received the landlord's surveillance footage, which showed an alley near the Zion apartment.

¶ 62    Ulanowski explained, "Once we received the video, we were able to obtain a license plate for a vehicle." When asked to explain what happened with regards to the video, trial counsel objected on hearsay and confrontation-clause grounds, arguing the someone from the lab that subsequently enhanced the surveillance video would need to testify. The trial court overruled the objection, determining that no one from the lab needed to testify, that Ulanowski could testify with

regard to actions he took in viewing the video and obtaining a license plate number, and that the video would not be put into evidence.

¶ 63　The examination continued, and Ulanowski testified that the images of the license plate on the video were blurry, so police sent the video to Target Forensic Laboratory Services for video enhancement. The next day, police received from the lab "21 images of the vehicle with an enhanced plate." (The enhanced images were not admitted into evidence.) Ulanowski was shown a photograph (People's exhibit No. 97) that was *sent* to the lab and asked what the photograph depicted. He responded, "This is a picture of a 2005 white Chevy Impala with a Missouri license plate of Adam, Lincoln, 4C9F." He confirmed that police received back information about the car depicted in the photo. Ulanowski further testified that police received information from an enhanced image of the photo (Peoples exhibit No. 97) sent to the lab and that they "were able to observe the license plate as a result." (The images received back from the lab were not admitted into evidence.) Police were able to obtain the name of the registered owner of the car depicted in People's exhibit No. 97. The owner was defendant. The vehicle was a 2005 Chevy four-door passenger vehicle with license AL4C9F. This is how police "got to this vehicle and the name of the registered owner." The trial court admitted into evidence and published a certified Missouri Department of Revenue motor vehicle registration receipt (People's exhibit No. 98) for a 2005 Chevy four-door passenger vehicle registered to defendant with license plate number AL4C9F. (Trial counsel did not cross-examine Ulanowski.)

¶ 64　　　　　　　　　　10. Office Craig Hethke

¶ 65　Zion police Officer Craig Hethke testified that, on February 16, 2018, at about 1:30 p.m., during the course of a traffic stop, he was dispatched to a shooting/home invasion at 2816 Edina Boulevard. His dash camera was activated during the stop and captured footage of a white Chevy

Impala with rear passenger-side bumper damage travelling south on Sheridan Road. The traffic stop was five blocks back and two blocks over from the Zion apartment.

¶ 66    Hethke further testified that, at the Zion apartment, he secured the residence with other officers. While documenting the scene with his body camera, Hethke heard Glover state that the shooter was Trigga.

¶ 67                                  11. Jason Kapusinski

¶ 68    Detective Jason Kapusinski testified that police received information about a possible suspect car, a white Chevy Impala with damage to the rear passenger-side bumper, that was observed near the Zion apartment. Police conducted a video canvas of the area—the corridor of Sheridan Road in Zion. They obtained surveillance footage from a restaurant at 3306 Sheridan Road. The footage depicted a white Chevy Impala traveling north on Sheridan Road near 33rd Street at 1:03 p.m. on February 16, 2018, and then traveling south at 1:41 p.m. The footage showed the Impala from a distance and did not show the license plate. The video depicts damage to the rear quarter panel of the passenger side, wrapping around the bumper.

¶ 69    Kapusinski learned that police had received a license plate number for a white Chevy Impala they believed was involved in the incident. Police also received, on February 21, 2018, information concerning the location of the vehicle. The vehicle was located in the parking lot of a residential multi-unit complex in Round Lake Beach at 1899 North Cedar Lake Road. There, Kapusinki saw the vehicle—the white Chevy Impala with the Missouri license plate No. AL4C9F that was observed near the crime scene—parked near the unit at 1937 North Cedar Lake Road. Kapusinski noticed damage to the rear bumper. He began surveillance and, at around 9 p.m., an individual resembling the suspect police were looking for exited the 1937 apartment near the

vehicle. Kapusinski described the individual as a black male, about 6 feet tall and between 200 and 215 pounds. He arrested the suspect, who was defendant.

¶ 70 Defendant had a cell phone and a gun on his person. The gun was a black Glock 19. The magazine was loaded and it had a flashlight and a laser sight attachment combo. The laser beam was green.

¶ 71                              12. Phillip Rathke

¶ 72 Office Phillip Rathke testified that he searched the Round Lake Beach apartment from which defendant was seen leaving. In the apartment's northwest bedroom, he found two employee IDs belonging to defendant. Officer Rathke also found in the same bedroom a Smith & Wesson SD 40 handgun, a Michael Kors gold watch, laser sights (one of which had a green beam), and ammunition of several different calibers (including 9 mm and .40 caliber). He also collected cell phones.

¶ 73 Rathke also collected evidence at 1801 Glenn in North Chicago (Hodges's residence), including different calibers of ammunition, two Glock magazines, a Smith & Wesson .40-caliber handgun, and two green laser sights.

¶ 74                              13. Nichole Berns

¶ 75 Nichole Berns testified that, in February 2018, she lived at 1863 Cedar Lake Road in the Cedar Villas apartments in Round Lake Beach. She went to high school with defendant and graduated in 2013. Defendant contacted Berns in February 2018. They caught up and hung out a few times at Berns's apartment, including on February 19, 2018. Defendant was alone in the apartment only when Berns used the bathroom or went to the laundry room. They arranged for defendant to visit again on February 21, but he did not come. Instead, a couple of days later, defendant called Berns from the jail. Defendant asked Berns how she was and asked her to water

her plants. Berns testified that her plants at the time were primarily fake. She did not understand defendant's statement.

¶ 76    The following day, defendant called again from the jail. He asked how Berns was doing and "kept saying sorry." Berns did not know why he said this. At some point, police came and searched Berns's house.

¶ 77                                    14. Joseph Richardt

¶ 78    Detective Joseph Richardt, an evidence technician, testified that, on February 21, 2018, he collected evidence at 1937 Cedar Lake Road in Round Lake Beach (defendant's apartment) in relation to defendant's arrest. Kapusinski gave Richardt a Glock handgun collected from the residence. The magazine and a chamber round had been removed. The caliber was 9 mm. He also collected about 15 cell phones in the bedroom, along with other evidence.

¶ 79    On February 26, 2018, Richardt went to 1863 Cedar Lake Road in Round Lake Beach (Berns's apartment) and collected a .40-caliber Glock handgun placed among fake plants on top of the kitchen cabinets. There was an extended magazine inside the gun, and it was not loaded. It did not have a laser sight attached to it.

¶ 80    Richardt also collected evidence at 1801 Glenn Drive in North Chicago (Hodges's residence). He located three rounds of .40-caliber ammunition, four cell phones, and a black Taurus magazine with 10 rounds. There were two boxes of ammunition in the garbage—one box of .40-caliber ammunition and one box of .22-caliber ammunition.

¶ 81                                    15. James Magna

¶ 82    James Magna testified as an expert in forensic cell phone analysis. He conducted a forensics analysis of defendant's phone. The phone contained a February 12, 2018, video showing

defendant holding a firearm with a laser attachment. The phone also contained an image of a newspaper article about the Zion apartment shooting.

¶ 83                                   16. Barry Adams

¶ 84    Barry Adams testified as an expert in fingerprint analysis. He developed latent prints on a firearm magazine. The magazine was an aftermarket one for a Glock .40-caliber (Glock 23 Gen4). Adams had fingerprint cards for six individuals, including defendant's. The impression on the magazine matched defendant's fingerprint.

¶ 85                                   17. Jeremy Bauer

¶ 86    Jeremy Bauer, a special agent assigned to the FBI's cellular analysis survey team, testified as an expert in historical cell site analysis. Bauer analyzed the call detail records for defendant's phone and a phone registered to Tradesha Davis, Tracy Davis's sister.

¶ 87    For defendant's and Tradesha's phones, Bauer ran his analysis for February 16, 2018, from about 10 a.m. to 3 p.m. and mapped the approximate locations of the cellular devices. For the period 1 p.m. through 1:40 p.m., defendant's phone interacted with a cell tower within a 1.71-mile arc south from the tower, consistent with the device being at the Zion apartment at 1:30:58 p.m. based on text message activity. Tradesha's phone received an incoming voice call and interacted with a cell site just to the east of the Zion apartment starting at 1:27:39 p.m., and the device could also have been at the apartment. At 1:39:10 p.m., Tradesha's phone received a call that was forwarded to voicemail, and it interacted with a cell tower to the south of the apartment, pointing back to the northeast.

¶ 88    Next, Bauer addressed the period 1:40 p.m. to 3 p.m. on February 16, 2018. He testified that defendant's phone interacted with a cell site in the Libertyville area, and, at 2:54:46 p.m., it interacted with a tower consistent with the phone being in the Round Lake Beach area. Tradesha's

phone interacted with a site consistent with the phone being in the Round Lake Beach area at 2:36:41 p.m.

¶ 89    Bauer further testified that the data does not reflect who is using the phone at that time.

¶ 90                                18. Quortney Walker

¶ 91    Quortney Walker lives in Kansas City, Missouri, but lived in Zion between 2006 and 2015. She met defendant in high school. Walker graduated in 2010. She and defendant started dating in May 2016, and the relationship ended at the end of 2017. Defendant lived with Walker in Kansas City during their relationship. While she lived with defendant, Walker owned firearms, including a Glock she purchased at Bass Pro Shops in Missouri. Defendant went with Walker to the store to purchase the gun. She kept the Glock in its case in her bedroom closet.

¶ 92    Walker further testified that defendant had a friend named Tracy Davis, whom he spoke to on the phone. They spoke often, almost daily, and would FaceTime each other. Walker spoke to Tracy about twice per week to say hello and, thus, was familiar with his voice.

¶ 93    While defendant lived with Walker, he purchased a white Chevy Impala and took the car with him when he moved to Chicago. About three weeks after he left Missouri, defendant called Walker and left her a voicemail message to call him because it was important. Walker called him back, and defendant stated that he was sorry and loved her and that he had her gun. His cousin broke into his car and stole it. Defendant asked for two weeks to get back the gun and bring it to Walker. Walker responded that she would report the gun as stolen. Defendant became upset, tried to talk her out of it, and promised to bring back the gun. He was angry and, after the call, texted Walker that she would get in trouble if she contacted the police. Walker did not go to the police, but the police came to her the next day, and she gave them her gun box.

¶ 94 In 2018, Walker received phone calls from defendant from the Lake County jail. She recognized his voice because she lived with him for about two years. Some of the calls were on a recorded line, and some were not. In May 2023, Walker again received a call from defendant. He told Walker not to come to court. (Trial commenced in August 2024.) She informed him that she was subpoenaed, and defendant told Walker that it was her fault for accepting the subpoena. He was angry and told Walker that she did not have to come to court. Further, "when I got to court, to be careful what I would say because what I'd say could eff everything up."

¶ 95 Walker also identified defendant's voice on a recorded call to Tracy (from inmate "Bradshaw"), where defendant stated, "I tried to clap all three of they ass, bro. They seen our faces, bro."

¶ 96                                        19. Investigator Paul Kehrli

¶ 97 Investigator Paul Kehrli interviewed Glover at the hospital on February 19, 2018. Glover stated that Trigga was responsible but was *not* one of the people involved in the shooting. Kehrli spoke to Glover about the robbery at 1801 Glenn in North Chicago.

¶ 98 Kehrli testified that the term "clap" is street slang for "shoot" and that the term "stick" means to bring a weapon or gun. Tracy was charged in 2023 in connection for the shooting. Police were not able to identify the second person who entered the Zion apartment.

¶ 99 Kehrli met Tasha at the police station on February 21. He was aware that she had made an identification on February 17 at the hospital. On February 21, Kehrli set up a lineup for Tasha and had someone else administer it to her. Prior to this, he spoke to her about the scruffy perpetrator, and she stated that he was about 5 feet 7 inches tall. She stated that she was 5 feet 4 inches tall and the perpetrator was a little bit taller than her. Defendant was included in one of the lineups, and he is over 6 feet tall. Kehrli believed that defendant fit the description and included him

because it is difficult for people to estimate height. During the administration of the two lineups, Tasha did not make an identification on the computer. Afterwards, Kehrli entered the room, confirming with Tasha that she was not able to identify anyone. He then asked if there was anyone in the lineups that triggered Tasha to think that "maybe" the person was the perpetrator, and she responded that there was someone in the first lineup, but his face was too fat. Kehrli noted that the photo in the lineup was not taken on the night of the incident. He retrieved a printout of the lineup and showed it to Tasha, who circled the person in position four—defendant—and noted that he looked like the shooter.

¶ 100                                      20. Gary Lind

¶ 101   Gary Lind, a forensic scientist in the firearm and toolmark section of the Northeastern Illinois Regional Crime Laboratory, testified, without objection, as an expert in firearms and toolmarks identification. He testified about his educational background and noted that firearms identification is not addressed in college but in an apprenticeship. Lind apprenticed for two years. He also attended training seminars (about 16 over his career) and specialized training through the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (in serial number restorations, full-auto functioning determinations, and silencer examinations). He also attends annual training. The crime lab is accredited, and he has worked there since 2007. Lind explained how firearms work, their components, the mechanics of firing a bullet, and the mechanics of a semi-automatic weapon. He also explained the methods he used to engage in firearms or toolmark evidence comparison, including comparative microscopy. Lind addressed class characteristics (*i.e.*, imparted before manufacture) and individual characteristics (*i.e.*, those imparted on the firearm during manufacture that are unintentional and unique to the firearm). He had been qualified in court 62 times as an expert in firearms and toolmark identification.

¶ 102  In February 2018, Lind received evidence from this case, including casings and projectiles. Specifically, he received a fired .22-caliber shell casing, along with items from the Zion apartment, which included six .40-caliber shell casings and five .40-caliber fired projectiles.

¶ 103  The six discharged shell casings were .40-caliber Smith & Wesson casings, with the same head stamp on the cartridge casing. The stamp read "Hornady" and ".40 S&W." Each had the same class characteristics of an elliptical breech-face cutout on the primer itself and a hemispherical firing pin impression.

¶ 104  The five fired projectiles were all .40-caliber, with each exhibiting polygonal rifling, which is not very common but is common to a certain group of firearms. The fired projectiles exhibited six lands and grooves with a right-hand twist.

¶ 105  Lind used a comparison microscope to compare the class characteristics and individual characteristics. He determined that the five of the six shell casings came from the same unknown firearm. However, as to the sixth one (People's exhibit No. 86), Lind could not determine if it was fired from the same unknown firearm. As to class characteristics, all six casings could have been fired from a Glock firearm.

¶ 106  Next, addressing the five projectiles and the bullet recovered from Beville's body (People's exhibit No. 152), Lind testified that a comparison microscope examination showed that each one was a .40-caliber bullet that exhibited six lands and grooves, right-hand twists, and polygonal rifling. The first four projectiles that were recovered from the crime scene were all fired from the same unknown firearm, as was the bullet recovered from Beville's body.

¶ 107  Lind further testified that he later received firearms to examine, specifically, a 9-mm Glock, a .40-caliber Smith & Wesson, and a .40-caliber Glock. The 9-mm Glock was a model 19 semiautomatic pistol and could not have fired any of the projectiles or casings in this case because

a 9-mm firearm is smaller than .40-caliber firearm and cannot fire .40-caliber ammunition. Similarly, the .22-caliber casing was much smaller than the .40-caliber and 9-mm casings; it was not related to the projectiles and casings he received.

¶ 108   The Smith & Wesson firearm was a model SD40 VE .40-caliber semiautomatic pistol.  It did not fire the projectiles and casings he examined, based upon other class characteristics.  The firearm has a barrel with traditional rifling, cut rifling, that does not match the polygonal rifling that was observed on the fired bullets.  Further, the firing pin is a different shape than that observed on the six discharged casings.   Thus, it was eliminated based upon differences in class characteristics.

¶ 109   Next, addressing a "Glock, model 23 Gen4 .40 S&W caliber semiautomatic pistol," Lind noted it had a serial number of BDNP485 (Peoples exhibit No. 1).  The number was unique.  Lind identified a firearms tracing report from the federal bureau and testified that it was a report for the Glock bearing the same serial number (People's exhibit No. 176).  The purchaser was Quortney Walker of Kansas City, Missouri, and it was purchased from Bass Pro Shops in Independence, Missouri.

¶ 110   Lind test-fired projectiles (*i.e.*, laboratory ammunition) using the Glock model 23 (People's exhibit No. 1)—the firearm found in Berns's apartment (defendant's friend) and compared the test-fired rounds to the firearms evidence recovered from the shooting.

¶ 111   Linds also compared People's exhibit No. 86 (one of the six shell casings from the crime scene that Lind could not determine if it was fired from the same firearm as the rest of that group of casings) to the test-fired projectiles, and it had the same class characteristics and individual characteristics: .40-caliber S&W, same elliptical aperture on the shell casing, and same firing pin shape on the shell casing.  However, Lind noted, the individual characteristics were not sufficient

from which to determine whether People's exhibit No. 86 could have been microscopically fired from the Glock model 23 (serial No. BDNP485).

¶ 112   Lind testified that, as to the first five casings, they were all microscopically identified as being fired from the Glock model 23 (People's exhibit No. 1). He also testified that the projectile removed from Beville was microscopically identified as being fired from the Glock model 23.

¶ 113   On cross-examination by trial counsel, Lind explained that the identification process for People's exhibit No. 86 involved looking at impressions made on the bottom of the casing. When a firing pin strikes the primer, he explained, it makes an impression. The material that is the primer sits in a cup and is forced back out around the pin, taking the shape of the firing pin. It also presses against the back of the breech face of the firearm. When comparing fired cartridges, one sees a reverse image of the aperture from which the firing pin came through and gets the impression of the firing pin. Lind further explained that a particular brand of firearms has similar class characteristics. For example, a .40-caliber Glock, models one through four, have the elliptical aperture/firing pin. The aperture size is tweaked to make sure that it can detonate various manufacturers' ammunition. This matched the impression made on People's exhibit No. 86. However, there were not enough impressions made on the casing for Lind to determine that it came from the Glock—there was not a significant amount of reproducibility. People's exhibit No. 86 could have been fired from a different .40-caliber generation one-through-four weapon.

¶ 114                                      21. Joel Shaw

¶ 115   Lieutenant Joel Shaw works for the Department of Corrections as a district intelligence coordinator, overseeing intelligence operations at northern Illinois facilities. He testified about the department's process for recording inmates' calls, including how its software system stores call records, recordings, call history, list of persons inmates may call, etc. Each inmate is assigned a

PIN that is unique to them. For a particular call, the system records the PIN that was used to initiate the call (which is attached to an inmate number), the date and time of the call, and its duration.

¶ 116    Shaw testified that each inmate has a list of up to 20 people they can call, and the list includes the individual's name, address, billing information, and phone number. A verification process is completed, which includes contacting the individuals on the list and collecting billing information.

¶ 117    Department records showed a call placed by inmate Jafrai Bradshaw on February 16, 2018, at 1:27 p.m. to Tracy, a portion of which was played for the jury. The recording reflects a person at the end of the call, allegedly defendant, purportedly stating, "I tried to clap all three of they ass, bro. They seen our faces, bro" and "I put the beam on all they ass, bro."

¶ 118                                    22. Verdict

¶ 119    The jury found defendant guilty of first degree murder and both counts of attempt murder. It also found that the State proved the sentencing add-ons that defendant was armed with a firearm and that he personally discharged a firearm that proximately caused death to another person.

¶ 120                               C. Post-Trial Motion

¶ 121    On September 30, 2024, trial counsel filed a motion for a new trial, arguing that the court erred in admitting the pretrial identifications of defendant made by Tasha and Kidd and that the court erred in allowing Ulanowski to testify about the license plate number seen from a third-party enhancement of a video. The court denied the motion.

¶ 122                                  D. Sentencing

¶ 123   The court sentenced defendant to consecutive prison terms of 50 years for first degree murder and 20 years for attempt murder of Glover. It sentenced him to a concurrent prison term of 12 years for the attempt murder of Tasha. Defendant appeals.

¶ 124                                II. ANALYSIS

¶ 125   Defendant argues that (1) trial counsel was ineffective for failing to (a) request a *Frye* hearing on the admission of firearms identification and comparison testimony, (b) object, for lack of foundation, to the admission of the firearms analyst's opinion, and (c) subject the analyst to meaningful cross-examination; and (2) he is entitled to a new trial, where the court's rulings, taken either individually or cumulatively, allowed (a) testimonial hearsay evidence generated by a forensics lab concerning a license plate number, and (b) an identification of defendant by a witness who, he asserts, did not have an adequate and ample opportunity to view the offense. For the following reasons, we affirm.

¶ 126                 A. Ineffective Assistance of Trial Counsel

¶ 127   Defendant argues first that trial counsel was ineffective for failing to request a *Frye* hearing on the admission of Lind's firearms identification and comparison testimony, for failing to object, for lack of foundation, to the admission of Lind's opinion, and for failing to subject him to meaningful cross-examination. He notes that the State presented Lind's testimony that the projectiles and shell casings recovered from the scene of the Zion shooting had been fired by a particular firearm. The firearm—a Glock model 23 Gen4 (People's exhibit No. 1)—had previously been in defendant's possession, had his fingerprints on it, and was found in Berns's, defendant's neighbor's, home. The State argued that defendant hid the firearm in Berns's apartment after it was used in the shooting. Defendant contends that a growing body of evidence has challenged the validity and reliability of firearms identification and comparison testimony of the type presented

in this case and that the scientific community has questioned the reliability of this type of testimony for almost two decades. Trial counsel, he asserts, provided no adversarial check on the State's presentation of this evidence, but implicitly acquiesced to the State's contention that the firearm found in Berns's home was the same firearm used in the shooting at the Zion apartment. Trial counsel, defendant argues, should have challenged the admission of Lind's opinion by asking for a *Frye* hearing, by objecting to his opinion due to lack of foundation, and by challenging Lind's testimony and opinion through meaningful cross-examination.

¶ 128 The sixth amendment to the United States Constitution guarantees defendants the right to the assistance of counsel for their defense (U.S. Const., amends. VI, XIV), and " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). Under *Strickland*, a defendant alleging that counsel was ineffective has the burden of showing both deficiency and prejudice. *Id.* at 687. To satisfy the deficiency prong, "the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). To satisfy the prejudice prong, "[t]he defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). Because a defendant must satisfy both prongs to prevail, courts need not "address both [prongs] of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *Evans*, 186 Ill. 2d at 94.

¶ 129 Counsel's performance is measured by an objective standard of competence under prevailing professional norms. *Id.* In considering whether counsel's performance was deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The decision whether to pursue an admissibility challenge under *Frye* is a matter of trial strategy. *People v. Gordon*, 378 Ill. App. 3d 626, 639 (2007); see also *People v. Bew*, 228 Ill. 2d 122, 127-28 (2008) (noting that the decision whether to file a motion to suppress is a matter of trial strategy). Our supreme court has directed that counsel's strategic decisions made after an investigation of the law and the facts are "virtually unchallengeable" (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)) or "virtually unassailable" (*People v. Ramsey*, 239 Ill. 2d 342, 433 (2010)). In other words, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005); *People v. Guest*, 166 Ill. 2d 381, 394 (1995). "[T]he defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 130 Under the second prong of *Strickland*, defendant must prove that there is a reasonable probability that the result of the proceeding would have been different without counsel's unprofessional errors. *Strickland*, 466 U.S. at 694. In order to establish prejudice resulting from failure to move for a *Frye* hearing, " 'a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had

the evidence been [excluded].' " *Bew*, 228 Ill. 2d at 128-29 (quoting *Patterson*, 217 Ill. 2d at 438); *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The failure to file a motion does not establish incompetent representation when the motion would have been futile. *Patterson*, 217 Ill. 2d at 438.

¶ 131 We will consider a claim of ineffective assistance of counsel for the first time on direct appeal, unless the claim depends on facts not in the record on appeal. See *People v. Veach*, 2017 IL 120649, ¶¶ 46-48. The State argues that we should not consider defendant's argument because it is dependent on evidence from outside the record that was not represented to the trial court and is raised for the first time on appeal. It contends that the claim can only properly be brought in postconviction proceedings. We disagree. Defendant utilized his cited authority to support his claim that the availability of such authority shows that trial counsel should have been aware of criticisms of firearms identification and comparison testimony and, thus, challenged Lind's testimony and opinion. He does not use the authority to prove the unreliability of firearms testimony. Thus, defendant's authority does not constitute evidence outside the record. See, *e.g.*, *People v. McKown*, 226 Ill. 2d 245, 273-74 (2007) (citing articles). Our standard of review is *de novo*. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40.

¶ 132                                         1. *Frye* Hearing

¶ 133 Defendant argues that there is a controversy over the reliability of firearms identification and comparison testimony and this justified a request for a *Frye* hearing in this case. He contends that, although reviewing courts previously considered the testimony and opinions of firearms examiners to be admissible, recent decisions show that the general acceptance of firearms comparison and identification testimony, such as the type offered by the State in this case, is unsettled. *Abruquah v. State*, 296 A.3d 961 (Md. 2023); *People v. Kimberley*, No. 22 C.R. 02932 01 (Cir. Ct. Cook County Jul. 1, 2025). Thus, he asserts, trial counsel should have requested a

*Frye* hearing to determine the admissibility of Lind's testimony and opinion and the failure to do so constituted ineffective assistance.

¶ 134    In Illinois, the *Frye* standard governs the admission of scientific evidence. *In re Detention of New*, 2014 IL 116306, ¶ 25. The standard is codified in Illinois Rule of Evidence 702 (eff. Jan. 1, 2011):

> "Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs."

¶ 135    The purpose of *Frye* is "to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinion is actually invalid.' " *New*, 2014 IL 116306, ¶ 26 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), abrogated on other grounds by *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004)). Under *Frye*, scientific evidence is admissible at trial only if it is based on a methodology or principle that is generally accepted in the relevant scientific field. *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004). To qualify as "generally accepted," the methodology or principle in question need not have gained universal acceptance or even be accepted by a majority of experts in the relevant field. *Id.* Instead, it is sufficient that the methodology underlying the expert witness's opinion is reasonably relied upon by experts in the field. *Id.* at 530. Additionally, the *Frye* standard applies only to scientific methodologies that are "new" or "novel." *Id.* A scientific methodology is considered "new" or "novel" in this context if it is original or does not resemble something formerly known or used. *Id.* A trial court may decide that a scientific methodology or principle is generally accepted by either (1) holding an evidentiary hearing or (2) taking judicial

notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. *McKown*, 226 Ill. 2d at 254. Whether a scientific methodology is "generally accepted" within the meaning of the *Frye* standard is reviewed *de novo*. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 136   In *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 54, the defendant relied primarily on a 2009 report from the National Academy of Sciences and our supreme court's decision in *McKown* to argue that the trial court erred in admitting firearms identification evidence without holding a *Frye* hearing. *Id.* The reviewing court rejected the defendant's argument, concluding that "[t]oolmark and firearm identification evidence is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*." *Id.* ¶ 61. It further determined that, "[f]ar from being unsettled, the law in Illinois is consistent in its admission of such evidence." *Id.* The *Rodriguez* court also distinguished firearms identification evidence from the horizontal gaze nystagmus test relevant in *McKown*, noting that the admissibly of firearms identification evidence was well-settled, whereas the latter had never been accepted after a *Frye* hearing in an Illinois court. *Id.* ¶ 58. The court also rejected the defendant's reliance on the National Academy of Sciences report, holding that "the report's concerns go to the weight and not to the admissibility of such evidence." *Id.* ¶ 62. Thus, it affirmed the admission of firearms identification evidence without the need for a *Frye* hearing. *Id.* ¶ 62; see also *Robinson*, 2013 IL App (1st) 102476, ¶ 91 (same).

¶ 137   Defendant acknowledges this background but argues that new developments and court challenges show that the issue of the evidence's admissibility is unsettled and can be considered novel by this court. In support, he cites to a Maryland decision, and reports cited therein, and a case from the Circuit Court of Cook County. *Abruquah*, 296 A.3d at 968, 997 (applying *Daubert-*

*Rochkind* standard and holding that a ballistics expert can testify that bullets at a crime scene are consistent with patterns on bullets fired from a suspect's gun but cannot offer an "unqualified opinion" of a match between them; reports, studies, and testimony relied on by the examiner did not demonstrate that the firearms identification methodology employed in the case could reliably support an unqualified conclusion that the bullets were fired from a particular firearm); *Kimberley*, No. 22 C.R. 02932 01, at 57-59 (conducting a Rule-of-Evidence-403 hearing on admissibility of firearms examination evidence and determining that firearms identification testimony was subject to exclusion under the rule because the risk of prejudicing, confusing, or misleading the jury in the case before it substantially outweighed the probative value of the evidence; further determining that the identification did not meet the foundational requirement for admissibility under Rule of Evidence 702; and acknowledging that it had rejected the defendant's request for a "Rule 702/*Frye* hearing because, citing *Rodriguez*, the general admissibility of firearm identification testimony is settled law in Illinois"). Defendant contends that, based on the foregoing, the type of testimony the State offered here was novel for *Frye* purposes and that trial counsel should have argued that firearms identification and comparison lacked general acceptance within its particular field.

¶ 138   We reject defendant's argument. Defendant relies on one published foreign decision, an Illinois trial court case, and a law review article. The fact there is a dearth of authority upon which he can rely cannot support an argument that the admissibility of expert testimony pertaining to firearms and toolmark identification is unsettled. Indeed, stated differently, it hardly reflects that recent court decisions in any notable number are questioning the admissibility of this evidence. Further, in *Kimberley*, upon which he primarily relies, the court rejected the defendant's request for a *Frye* hearing and excluded the firearms evidence based on, as defendant acknowledges, Rule

403 issues specific to that case. *Rodriguez* and *Robinson* remain good law. Accordingly, trial counsel could not have rendered ineffective assistance for failing to request a *Frye* hearing.

¶ 139                                    2. Foundation

¶ 140  Next, defendant argues that trial counsel was ineffective for failing to object to Lind's opinion for lack of foundation. Lind offered his opinion, defendant asserts, based on a subjective comparison without any testimony that his opinion stemmed from the general consensus within his field or through citation to any professional literature supporting his opinion.

¶ 141  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011). To be admissible, expert testimony must be supported by an adequate foundation, showing that the facts or data relied upon by the expert are of a type relied upon by experts in the relevant field. Ill. R. Evid. 703 (eff. Jan. 1, 2011). Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) provides, "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise." In such instances, the burden shifts to the opposing party to explore the underlying facts or data through rigorous cross-examination. *People v. Murray*, 2019 IL 123289, ¶ 33. "However, the burden remains on the State to prove all the elements of the offense, which may include the burden of laying a proper foundation for the admission of an expert opinion relevant to one of those elements." *People v. Petrie*, 2021 Il App (2d) 190213, ¶ 69.

¶ 142  Defendant relies on *Petrie*, where the defendant day care owner was charged with injuring the victim, a child in her care. Multiple experts testified as to the cause and circumstances of the injury (including whether it occurred while the child was at the day care or sometime before). On

appeal, the defendant argued that trial counsel was ineffective for failing to sufficiently cross-examine the State's expert on the bases of his opinions (that the causal injury—shaking—must have occurred immediately before a seizure and that there would not have been a lucid interval). The question of timing, the defendant argued, was pivotal in the case, and the only way to establish when the causal event occurred was through expert testimony. However, trial counsel did not ask the expert to identify a basis in the professional literature for his immediate-effect/no-lucid-interval opinion and did not inquire whether the general consensus of professionals supported that opinion. The reviewing court held that there was deficient performance, in part, because the expert's opinion was subject to objection as being inadmissible for lack of foundation. *Id.* ¶¶ 72, 75. The court noted that the record was not clear as to the reason for the expert's opinion, he never testified that his opinion was the general consensus in his field of child abuse pediatrics, and he did not identify any professional literature supporting his opinion. *Id.* ¶ 72.

¶ 143 Here, defendant argues that Lind's conclusion, that the firearm found in Berns's apartment fired the bullets and shell casings recovered after the shooting, was based on the reproduction of class and individual characteristics in test-fired shots that were compared to the bullets and shell casings. Like *Petrie*, defendant asserts, Lind did not testify that his opinion stemmed from the general consensus within his field or identify any professional literature supporting his opinion. Nor did he testify to the findings of his subjective comparison or identify any shared individual characteristics between the test-fired shots and the evidence recovered after the shooting. Defendant also argues that Lind did not provide a definition of sufficient agreement or provide details as to whether seminars he attended supported his opinions.

¶ 144 We reject defendant's argument. Lind testified about his background, education, training, and experience. He also explained the differences between class and individual characteristics and

his use of comparative microscopy to evaluate ballistics evidence. Lind also testified about his examination of the evidence in this case. *Petrie*, unlike this case, involved competing experts and the court's holding was based on the fact that the reason for the expert's opinion was unclear. *Id.* ¶ 72. In *People v. Robinson*, 2018 IL App (1st) 153319, a case with circumstances more like this case than *Petrie*, the defendant argued that a ballistics expert provided insufficient foundation for her conclusions linking shell casings found at the scene to particular firearms. She did not challenge the expert's qualifications to testify as an expert in ballistics identification or the general admissibility of the evidence. Rather, the defendant challenged whether the expert sufficiently disclosed the reasons for her opinions to establish the reliability of the underlying information. The reviewing court held that the lack of detail in the expert's testimony went to its weight, not its admissibility, and defense counsel's "inability (or unwillingness) to put [the expert] through her paces does not make the foundation inadequate." *Id.* ¶ 19 (citing *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 125 (firearms expert who testified about class and individual characteristics of bullets, without specifying which individual characteristics matched particular bullets, laid sufficient foundation; inadequacies affected weight of opinion, not admissibility)). We come to the same conclusion. Accordingly, we reject defendant's argument that trial counsel performed deficiently by not objecting to Lind's opinion for lack of foundation.

¶ 145                                    3. Cross-Examination

¶ 146   Next, defendant argues that trial counsel should have meaningfully cross-examined Lind about the reliability of firearms identification and comparison testimony. A meaningful challenge, he asserts, would have educated the jury on the controversies and questions raised repeatedly about the reliability of such testimony. Defendant contends that counsel's advocacy fell below an objective standard of reasonableness. Counsel did not question Lind about the ongoing criticisms

in the field, failed to inquire about error rates in the field, and failed to inquire about the criteria for identification that did not rely on subjective visual perceptions. Defendant also argues that counsel's questions were not thorough and did not support the defense's theory that defendant was misidentified and may have simply hid a firearm for another.

¶ 147 Defendant notes that counsel's cross-examination of Lind elicited that it was possible that a different .40-caliber firearm could have been used in the shooting, which implicitly suggested another gun or person was involved in the offense and "weakening" the defense's argument that defendant was misidentified. He further argues that, regardless of the fact that counsel was still able to argue that defendant was misidentified based on other evidence in the record, a meaningful cross-examination would have been consistent with the defense's theory and would have strengthened that argument by undermining the reliability of Lind's conclusion. At a minimum, defendant contends, the State's contention that defendant possessed the murder weapon would have been weakened.

¶ 148 The decision of whether and how to conduct a cross-examination of a witness is generally a matter of trial strategy and will not support a claim of ineffective assistance of counsel. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62. "To prove otherwise, a party must show that counsel's conduct was 'so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *Petrie*, 2021 IL App (2d) 190213, ¶ 66 (quoting *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82). Decisions regarding the manner in which to cross-examine a particular witness involve the exercise of professional judgment, which is entitled to substantial deference. A defendant can only prevail on an ineffectiveness claim by showing counsel's approach to cross-examination was objectively unreasonable. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997).

¶ 149   We reject defendant's argument.  His assertion that counsel should have questioned Lind about the reliability of firearms identification and comparison testimony is unavailing because, as we concluded above, that issue is settled.  Thus, we cannot conclude that counsel's conduct in this respect was irrational or objectively unreasonable.  Similarly, we reject defendant's claim that counsel's questions were not thorough and did not support the defense's theory that defendant was misidentified and may have simply hid a firearm for another.  Defendant's argument at trial was that he was misidentified by Glover and the other occupants of the Zion apartment and that Glover told his mother and others that one of the shooters was Trigga, who should have been put on trial.  As defendant acknowledges, counsel was still able to argue that defendant was misidentified based on other evidence in the record.  Further, as the State notes, trial counsel was faced with the very difficult task of arguing that, although defendant's phone and car were in the area of the shooting, defendant personally was not.  Given these circumstances, we cannot conclude that counsel's cross-examination was objectively unreasonable.

¶ 150   In sum, we reject defendant's argument that trial counsel was ineffective for failing to meaningfully cross-examine Lind.

¶ 151                               B. Evidentiary Ruling – License Plate

¶ 152   Next, defendant argues that the trial court erred in allowing testimony, through police witness Ulanowski, of evidence relating to his license plate.  He contends that it violated his right to confrontation because it was testimonial hearsay.  Specifically, he challenges Ulanowski's testimony regarding photos of his license plate that were sent to a lab for enhancement and his informing the jury of the license plate number.  Thereafter, he notes, the State published a certified document showing that defendant was the registered owner of a vehicle with that same license plate number.

¶ 153    We review a trial court's decisions regarding the admission of evidence for an abuse of discretion. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 84. An abuse of discretion occurs when the trial court's decision is unreasonable. *Id.* We review *de novo* a sixth amendment claim. *People v. Leach*, 2012 IL 111534, ¶ 64.

¶ 154    Hearsay—"a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"—is generally inadmissible, with various exceptions. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011). Conversely, an out-of-court statement is not hearsay if it is offered for some purpose other than to establish the truth of the matter asserted. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010).

¶ 155    The sixth amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const., amend. VI. This provision, known as the "confrontation clause," extends to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Pointer v. Texas*, 380 U.S. 400, 406 (1965); see also Ill. Const. 1970, art. I, § 8. Only statements that are "testimonial" make the speaker a "witness" within the meaning of the confrontation clause. *Davis v. Washington*, 547 U.S. 813, 821 (2006). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.*

¶ 156    When determining whether a forensic report is testimonial in nature, an objective test applies, assessing "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Leach*, 2012 IL 111534,

¶ 120. If the inquiry reveals that the forensic report was "made for the purpose of proving the guilt of a particular criminal defendant at trial, it is testimonial." *Id.*

¶ 157　Under *Crawford v. Washington*, 541 U.S. 36 (2004), resolution of a confrontation clause claim requires addressing the following: (1) was the out-of-court statement hearsay because it was offered for the truth of the matters asserted therein? (2) if hearsay, was the statement admissible under an exception to the hearsay rule? (3) if admissible hearsay, was the statement testimonial in nature? and (4) if testimonial, was the admission of the statement reversible error? *People v. Leach*, 2012 IL 1111534, ¶ 63. A certificate from a state laboratory attesting a substance was cocaine, for example, has been held to be testimonial hearsay when offered in evidence against a defendant charged with drug distribution and trafficking; it was functionally identical to live testimony and inadmissible unless the forensic analyst testified. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009).

¶ 158　The constitutional right to confront witnesses is not implicated by a testimonial out-of-court statement offered for a purpose other than establishing the truth of the matter asserted. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 67. Thus, a police officer may testify regarding the steps taken in an investigation of a crime when such testimony is necessary to fully explain the State's case, though such testimony shall not include the substance of any conversation with a person who is not testifying. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 18. An "officer's testimony recounting steps taken in the course of an investigation may be admissible without violating a defendant's confrontation rights, even though the officer's description of the progress of the case might suggest that nontestifying witnesses implicated the defendant." *People v. Johnson*, 116 Ill. 2d 13, 24 (1987). Such testimony is not considered hearsay. *People v. Johnson*, 116 Ill. 2d 13, 24 (1987); *People v. Gacho*, 122 Ill. 2d 221, 248 (1988). This is so because the

testimony is within the personal knowledge of the officer and not used to prove the truth of the matter asserted. *People v. Sample*, 326 Ill. App. 3d 914, 920 (2001). However, an officer's testimony becomes inadmissible hearsay if the testimony recounts "the substance of a conversation." *Gacho*, 122 Ill. 2d at 248.

¶ 159 Defendant argues that Ulanowski's testimony regarding the forensic report was hearsay because it was admitted for the truth of the matter asserted. He further argues that the forensic report was testimonial because the primary purpose of the enhanced images of the license plate was to prove defendant's guilt. The Missouri vehicle registration form was apparently admitted, he asserts, solely to bolster the results of the lab's enhanced images from the surveillance footage. Defendant contends that the enhanced images were critical pieces of evidence that allowed investigators to develop defendant as a suspect, as the plate number was obtained early in the investigation and allowed police to locate defendant's car in Round Lake Beach.

¶ 160 The State responds that Ulanowski's testimony was admissible as non-hearsay to show the course of the police investigation and not as substantive evidence to prove that defendant was present at the murder scene. The testimony about the forensic enhancement, it contends, was admitted to show that Ulanowski received information—a license plate number—that led to the investigation of the vehicle registration records and the subsequent discovery that the license plate number was registered to defendant, who was then developed as a suspect. The police, the State further contends, subsequently obtained additional evidence placing defendant at the murder scene, including his voice and his phone records.

¶ 161 We note that the enhanced images were not admitted into evidence. Only the unenhanced stills from the surveillance footage were shown to the jury. The primary question here is whether the officer's testimony was limited to the investigatory steps taken leading up to the identification

of defendant or if Ulanowski testified to the substance of any statement by a non-testifying person. Another critical issue is whether the lab's images were made for the purpose of proving defendant's guilt.

¶ 162    Ulanowski testified that images of the license plate from the video were blurry so police sent the video to a lab for video enhancement.  The next day, police received images with an enhanced license plate.  Next, Ulanowski was asked what was depicted in a photograph sent to the lab (People's exhibit No. 97), and he responded, "That is a picture of a 2005 white Chevy Impala with a Missouri license plate of Adam, Lincoln, 4C9F."  He then testified that police received information from the lab about the car depicted in exhibit No. 97.  Immediately after this, the State had admitted into evidence People's exhibit No. 98, the certified Missouri motor vehicle registration receipt.  When asked if, as a result of receiving an enhanced image from the photo sent to the lab, police obtained the name of the registered owner of the car depicted in exhibit No. 97, Ulanowski responded that they did.  The registered owner was defendant.

¶ 163    We conclude that, even if Ulanowski's testimony was inadmissible hearsay or violated the confrontation clause, the error was harmless beyond a reasonable doubt primarily because it was properly admitted later, during another detective's testimony, and because the evidence supporting defendant's convictions, excluding this testimony, was overwhelming.

¶ 164    Violations under *Crawford* are subject to harmless-error analysis.  *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).  Confrontation clause violations will be held harmless when "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained."  *Id.* There are "three different approaches for measuring error under this harmless-constitutional-error test: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction,

and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.* The State bears the burden of proof. *Id.* We begin with the third test.

¶ 165 Ulanowski's testimony was duplicative of properly admitted evidence, specifically, via officer Kapusinski's testimony. Kapusinski testified that police received information about a possible suspect vehicle, a white Chevy Impala, that was observed near the Zion apartment and that police conducted a video canvas of the area. He noted that there was damage to the rear bumper of the vehicle. Footage obtained from a nearby restaurant depicted a white Chevy Impala traveling near the apartment around 1 p.m. and 1:40 pm. It did not depict the license plate, but police received a license plate number they believed was involved in the incident. Kapusinski further testified that police also received information concerning the location of the vehicle. It was located in Round Lake Beach at 1899 North Cedar Lake Road, and Kapusinski saw the vehicle— a white Chevy Impala, with Missouri license plate No. AL4C9F, that was observed near the crime scene—parked near the unit at 1937 North Cedar Lake Road. He noticed damage to the rear bumper. He began surveillance and subsequently arrested defendant as he exited the 1937 apartment. A photograph of the vehicle, depicting it parked outside the 1937 apartment and with the visible license plate number, was admitted into evidence during Kapusinski's testimony, which Kapusinski testified was the suspect vehicle that was observed near the scene of the crime. Thus, the specific license plate number was properly admitted via other testimony at trial, satisfying the third test. Relatedly, as to the first test, we cannot conclude that the error contributed to the conviction because, again, the evidence was admitted via other testimony.

¶ 166 Finally, as to the second test, we conclude that the other evidence at trial overwhelmingly supported defendant's convictions. Defendant was recorded confessing to the crime. Walker,

defendant's former girlfriend, identified defendant's voice on a recorded call to Tracy, wherein defendant stated, "I tried to clap [(*i.e.*, shoot)] all three of they ass, bro. They seen our faces, bro." He also stated that he "put the beam on all they ass, bro." Further, the evidence reflected that defendant stole Walker's gun, and, after the incident, he called her and asked her not to report it as stolen and told her not to come to court. Walker's gun was recovered from Berns's apartment, where defendant had been a few days before the incident, and, in an attempt to have her locate the gun he had hidden in her apartment, defendant called Berns from jail and instructed her to water her plants, most of which were fake. A Michael Kors watch was located in the Round Lake Beach apartment where defendant was staying. Cell phone data placed defendant's phone (and Tradesha's) near the Zion apartment at the time of the incident. And defendant's vehicle was observed traveling to and from that location (with one upstairs neighbor observing two black men running from the apartment after the shooting to a white Chevy (albeit a 1996 Malibu); another neighbor observing one man get into a white four-door sedan with a damaged passenger-side rear bumper and identifying the vehicle from surveillance stills of an alley near the Zion apartment; officer Hethke's traffic stop footage from the area showing a white Chevy Impala with rear passenger-side bumper damage travelling south on Sheridan Road; and surveillance footage from a restaurant on Sheridan Road near the apartment showing a white Chevy Impala with rear bumper damage traveling north shortly before the shooting and then traveling south shortly after the shooting). Photographs of defendant's vehicle depicted rear passenger bumper damage. After the incident, cell phone data placed defendant near Berns's apartment. The evidence further showed that defendant's fingerprints were located on the magazine of Walker's Glock model 23 Gen4 .40-caliber firearm, and Lind testified that the projectile removed from Beville's body was

microscopically identified as being fired from Walker's Glock firearm. Finally, both Tasha Davis and Kidd identified defendant in photo lineups.

¶ 167   In sum, even if the trial court erred in admitting Ulanowski's testimony concerning defendant's license plate number, any error was harmless beyond a reasonable doubt.

¶ 168                              C. Motion to Suppress - Identification

¶ 169   Defendant's final argument is that the trial court erred in denying his motion to suppress the identification made by Kidd, thereby violating his due process rights. He maintains that Kidd did not have a full and fair opportunity to view the offenders in the Zion apartment; rather, she was in a separate room and mostly heard the incident. Defendant requests that we reverse the court's order, reverse his convictions, and remand for a new trial.

¶ 170   We employ a two-part standard of review to a circuit court's ruling on a motion to suppress. First, we accord "great deference to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence." *People v. Cregan*, 2014 IL 113600, ¶ 22. Second, we review *de novo* the trial court's ultimate legal ruling on the motion. *Id.*

¶ 171   "Due process concerns from the admission of identification evidence arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *People v. Johnson*, 2026 IL 131337, ¶ 62. However, the "use of suggestive and unnecessary procedures does not inevitably compel suppression of the resulting identification." *Id.*

> "Instead of mandating a *per se* exclusionary rule, due process requires courts to assess, on a case-by-case basis, whether the police acted improperly and whether that conduct created a 'substantial likelihood of misidentification.' *Biggers*, 409 U.S. at 201; *Perry*, 565 U.S. at 239; see *Brathwaite*, 432 U.S. at 116. Reliability of the eyewitness identification is the linchpin of that evaluation, and where the indicators of a witness's

ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed. *Perry*, 565 U.S. at 239. If not, identification evidence that is otherwise admissible should be submitted to the jury. *Id.*" *Johnson*, 2026 IL 131337, ¶ 63.

¶ 172 "[T]he defendant has the burden of proving that a pretrial identification was impermissibly suggestive," and the State "may rebut a defendant's showing by providing clear and convincing evidence that the witness's identification is based on [the witness's] independent recollection of the incident." *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 31. We must assess whether, "under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive." *Id.* ¶ 64. The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.*

¶ 173 Defendant argues that the lineup procedure was suggestive, in violation of section 107A-2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107A-2 (West 2022)), and, therefore, conducive to misidentification by Kidd. He notes that three lineups were administered to Kidd on February 20, 2018. The first two complied with the statute because an independent administrator conducted the lineups through a computer program. Neither of the first two lineups resulted in Kidd making an identification, and defendant's photo was included in one of the lineups. However, the third lineup, defendant asserts, was administered by officers with knowledge of defendant's status as a suspect, thus, violating the statute. He contends that the officers could see defendant's placement on the photographs while administering the third lineup. Even the trial court, he notes,

found that the lineup procedure was not followed.  Accordingly, the first prong of the test to show suggestive identification was established.  Next, he contends that the State did not establish by clear and convincing evidence that the identification was based on Kidd's independent recollection.  Kidd, he notes, did not have an adequate and ample opportunity to view the offenders at the time of the crime; the only time she saw them was when they entered the apartment through the side door that led to the kitchen.  At this time, Kidd was by the bedroom and stated that she got on the ground and then moved to the bedroom.  At trial, defendant further notes, Kidd testified that she could not see, but was hearing the events, and she did not see who fired the firearm at the end of the incident because she ran into a closet.  Tasha's testimony corroborated that Kidd was in the bedroom, and Glover noted he did not see Kidd when the offenders took him out of the bathroom.  Finally, defendant argues that Kidd's description of the offender was vague and uncertain and that the presence of guns prevented her from focusing on the offenders' faces.

¶ 174    We reject defendant's argument and conclude that the trial court did not err in denying his motion to suppress Kidd's identification.  Kidd initially told police that she did not get a good look at the men who entered the Zion apartment and did not see the face of one of the men at all.  However, she did, according to detective Pugliese, see the eyes of the second man, who was rummaging in the room, whom she later identified as defendant.  On the day of the identification, detective Pugliese assembled the two lineups that were administered to Kidd by an independent administrator.  Pugliese testified that, after she and Bush entered the room at the conclusion of the computer administration, Kidd stated that one of the individuals in the second lineup looked familiar, specifically, the person in position four; he looked like one of the boys she saw.  Pugliese and Bush did not know who was in position four.  Pugliese asked Kidd why this person looked familiar, and, according to Pugliese, Kidd stated that he was familiar, specifically his face, as the

person who rummaged through the apartment during the incident and stated, "I'm gonna kill your mama." Bush testified that Kidd stated that the man's eyes and face looked familiar. After Pugliese obtained a printout of the lineup and returned, Bush informed her that Kidd had stated that the man wore a hat on the day of the incident. Bush, commenting on the videotape of the interview during the hearing, testified that, after he and Pugliese entered the room, Kidd "immediately" identified defendant, who was in position four. (This is reflected in the video.) She stated that the man looked different without a hat on. She wrote on the lineup photo, "I really can't say it's him, but the face just looks like one of the boys." Both men, Kidd stated, were taller than her (she is 5 feet 9 inches tall), and they wore gray hoodies and black beanies. Kidd also told the detectives that the individual with the glasses shot Glover; she did not see who fired the shots at the end of the incident.

¶ 175 Contrary to defendant's suggestion, the evidence reasonably reflected that Pugliese and Bush were unaware of defendant's placement in the lineup when Kidd stated the man in position four looked like one of the boys she saw. We also reject defendant's argument that Kidd did not have an adequate and ample opportunity to view the offenders. Kidd acknowledged to police that she did not see the face of one of the men, but she got a good look at the eyes of the second one (*i.e.*, the one rummaging in the room), whom she identified as defendant. We reject defendant's argument that, because Kidd only saw the offenders when they entered the apartment, this was not an adequate and ample opportunity to view them. She was able to describe their clothing, that defendant wore a hat, both were taller than her, and both had guns. Kidd also stated that one of the men wore disguise glasses.

¶ 176 The trial court noted that it considered that Kidd did not identify defendant during the computer lineup administration. However, it further determined, consistent with the video, that,

after the detectives entered the room, Kidd "said immediately one of them looks familiar." The trial court also found that the detectives did not ask any suggestive questions, but only follow-up questions. And it noted that Kidd stated, "It looks like the guy." On this basis, the court determined that the State met its burden to show that Kidd identified defendant based on her independent recollection and that the procedure used was not unduly suggestive such that there was a substantial likelihood of misidentification.

¶ 177   In sum, the trial court did not err in denying defendant's motion to suppress Kidd's identification. Further, because we have assumed that, at best, there was only one error as to the court's evidentiary rulings, there was no cumulative error. *People v. Quezada*, 2024 IL 128805, ¶ 46 ("cumulative error can occur only when there is more than one error").

¶ 178                                   III. CONCLUSION

¶ 179   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 180   Affirmed.