2026 IL App (2d) 250171-U
No. 2-25-0171
Order filed June 22, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

JAMES E. BROWN, JR., Defendant-Appellant.

Appeal from the Circuit Court of Kendall County.
Honorable Jody P. Gleason, Judge, Presiding.
No. 20-CF-327

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's trial counsel was not ineffective by: (1) failing to request a *Frye* hearing regarding the admissibility of the State's firearms identification expert testimony; (2) failing to object to a purported lack of foundation for the firearms identification expert's testimony; and (3) failing to cross-examine the firearms identification expert regarding purported reliability issues in firearms identification analysis.

¶ 2    Defendant James E. Brown, Jr., was convicted by a Kendall County jury of two counts of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) for the November 11, 2020, shooting deaths of Cassandra and Changina Chatman. Defendant appeals, arguing that his trial counsel was ineffective for failing to sufficiently challenge the State's firearms identification expert whose

testimony connected a gun found in defendant's car to the bullets that killed Cassandra and Changina. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4      The following facts were established at defendant's trial conducted from February 3 to February 6, 2025.

¶ 5      Cassandra and Changina lived at 75 Sierra Road in the Boulder Hill neighborhood of unincorporated Kendall County with Emma Jean Chatman, who was Cassandra's mother and Changina's grandmother. Chantrell Feemster, Emma's grandson, also lived with them. Around 11 a.m. on November 11, 2020, Emma heard popping noises. She ran to the front of her house and found that Cassandra and Changina were shot. Emma saw a black truck with a person hanging out of the vehicle driving down Sierra Road.

¶ 6      Several neighbors also heard the shooting. One neighbor saw a black SUV with a person standing in the sunroof holding a gun but did not see the person's face. Another neighbor showed police a still image of a black vehicle captured by a doorbell camera. The image showed a person in dark clothing standing in the sunroof of a black SUV with silver trim driving down Sierra Road around 11:05 a.m. The image did not show the vehicle's license plate, nor did it show the person's identity or whether the person was holding a gun.

¶ 7      Police found Cassandra in the front room of the house unconscious and not breathing with injuries on her right side. Changina was in a bedroom lying on the bed with a significant wound to her head. Cassandra was pronounced dead that day, while Changina died later in the hospital. Autopsies determined that Cassandra died from a gunshot wound to the chest and Changina from complications from a gunshot wound to the head. A .223-caliber bullet was recovered from Cassandra's body.

¶ 8      Police found between 8 to 10 bullet holes in the house at 75 Sierra Road. Most of the bullet holes were three to four feet above the floor. Police also found 14 .223-caliber rifle shell casings in the road in front of the house.

¶ 9      Bryan Hammond, an officer with the Aurora Police Department, testified that he received an alert after the shooting to look for a black Porsche Cayenne. Hammond recognized the address of the shooting because he knew that Feemster, a member of the Gangster Disciples street gang, lived at 75 Sierra Road. The Gangster Disciples were rivals with the Vice Lords and Black Disciples street gangs. He proceeded toward the west side of Aurora, which is Vice Lord territory. He saw a black Porsche Cayenne, turned around, and followed it to Linn Court in North Aurora. Linn Court is an apartment complex with a one-way entry road in the front and a one-way exit road in the back.

¶ 10     Hammond, however, did not follow the Porsche into Linn Court. Instead, he stayed on the road outside and relayed the car's location to Darren Pedota, a gang investigator for the Aurora police. He entered Linn Court after Pedota arrived and found that Pedota had already detained two occupants from the Porsche, Jaquarance Handley and Tamari Boykins. Hammond did not see defendant exit the Porsche, but he did see him walking in the Linn Court complex.

¶ 11     Pedota testified that he and his partner went to Linn Court after learning the information from Hammond. When they arrived, they saw the Porsche in the parking lot and parked their car to block it. As he approached the car with his handgun drawn, Pedota saw the driver sitting in the car and a back seat passenger make "furtive movements." Pedota and his partner made the driver—Handley—and the back-seat passenger—Boykins—exit the vehicle. They found a handgun in the back seat but did not see a rifle. Pedota saw defendant sitting in a different vehicle when he arrived at Linn Court.

¶ 12   Defendant entered his apartment after arriving back at Linn Court. Police waited for a warrant nearby the apartment. Defendant was arrested after he opened his front door and stepped outside. No weapons were found inside his apartment after a search. During a recorded interview at the police station, defendant admitted that he was in the passenger seat of the Porsche on November 11. However, he claimed that he was being driven to pick up his car from an auto shop and that he had nothing to do with the shooting. Defendant also acknowledged that he was a member of the Black Disciples.

¶ 13   Surveillance footage from Linn Court showed the Porsche arrive shortly after 10 a.m. on November 11. A person wearing a gray shirt, identified as Handley, exited the vehicle. A doorbell camera from defendant's neighbor showed Handley at defendant's door at 10:10 a.m. At 10:29 a.m., Handley and a person wearing a puffy black jacket, identified as defendant, came out of an apartment. Around 10:30 a.m., Handley reentered the Porsche in the driver's seat, and defendant got in the front passenger seat.

¶ 14   Shortly thereafter, an Aurora police street surveillance camera showed the Porsche pull into the parking lot of EZ Mart, a store in Aurora. The vehicle stayed parked in front of the store for about a minute before leaving. It was not clear from the footage whether anyone entered or exited the car during this time.

¶ 15   Around 10:58 a.m., the Porsche was captured by a surveillance camera driving southbound down Boulder Hill Pass towards Sierra Road. A doorbell camera captured the Porsche driving down Sierra Road at 11:05 a.m. The doorbell footage also captured audio of gunshots as the vehicle exited the camera's view.

¶ 16   No footage captured the Porsche until it arrived back at Linn Court at 11:41 a.m. After it arrived at Linn Court, defendant exited the front passenger side and walked toward an apartment.

About 10 minutes later, Boykins and an unidentified woman walked to the Mercedes and placed a red bag in the trunk.

¶ 17 At noon, Boykins exited defendant's apartment, jogged down the sidewalk toward the Porsche, entered the front passenger seat, and quickly returned to defendant's apartment at 12:03. At 12:04 p.m., Boykins again entered the front passenger seat of the Porsche. Several seconds later, defendant came to the front passenger door, Boykins exited, he and defendant exchanged jackets, and Boykins sat in the back passenger seat and defendant in the front passenger seat. The Porsche exited Linn Court at 12:06 p.m.

¶ 18 The Porsche returned to Linn Court at 1:22 p.m. It parked directly next to the Mercedes. Defendant exited the front passenger seat of the Porsche and entered the driver's side of the Mercedes. He moved the Mercedes to a different parking spot in Linn Court. Shortly after the Mercedes moved, an unmarked police car pulled in front of the Porsche and the officers exited with their handguns drawn. After defendant parked the Mercedes, he was seen exiting the car, looking back toward the Porsche, and entering his apartment.

¶ 19 During their investigation, police collected a black jacket and black hooded sweatshirt from Boykins, and a black sweatshirt worn by defendant. Inside the Porsche, police found a puffy black Guess jacket and a black Kappa jacket. A brown wallet with defendant's ID was found inside the Guess jacket. Police also recovered two cell phones from inside the Porsche. Videos on defendant's cell phone showed defendant and Boykins holding an AR-style firearm.

¶ 20 Inside the Mercedes, Bryan Harl, the lead detective, found a red backpack inside the trunk. It contained two firearms: an AR-15 style firearm and a Springfield XD .45-caliber pistol. The AR-15 used 5.56-caliber or .223-caliber ammunition. The backpack also contained a 30-round

capacity magazine loaded with 6 rounds of 5.56-caliber ammunition, a plastic bag containing 99 rounds of 5.56-caliber ammunition, and some loose rounds of 5.56-caliber ammunition.

¶ 21    Gunshot residue kits were administered on Handley, Boykins, and defendant, as well as the exterior sunroof area of the Porsche, and the two jackets found inside the Porsche.  The analysis of the kits showed the presence of gunshot residue on both of Boykins' hands, Handley's left hand, and defendant's right hand.  Gunshot residue was also found on the passenger side of the exterior portion of the sunroof.  Both jackets also tested positive for gunshot residue.

¶ 22    DNA was collected from the AR-15 pistol grip, several loose rounds of ammunition, the Kappa jacket, the Guess jacket, and a Nike jacket.  None of the DNA collected matched defendant, Handley, or Boykins.  Indeed, those three individuals were excluded as contributors to the DNA recovered on the pistol grip.

¶ 23    Justin Barr testified for the State as an expert in firearms identification.  He worked for the Illinois State Police division of forensic services since October 2001.  Barr graduated from Illinois State University with a degree in biological science.  With the state police, Barr received a two-year training course with written, oral, and practical exams, followed by a period of supervised case work.  Barr was also a member of the Association of Firearms and Toolmark Examiners (AFTE).  He has worked on over 3,000 cases for the state police.  The state police forensic science lab was accredited by the American National Standard Institute.

¶ 24    Barr explained that determining whether a particular bullet came from a particular firearm was based on sufficient agreement of class and individual characteristics.  Class characteristics are general characteristics shared by bullets or firearms of a particular type.  Individual characteristics are unique to a specific firearm and made during the manufacturing process.  The individual characteristics of a firearm show up as a complex pattern of striated lines on a bullet.  A comparison

microscope is used to compare the striations on two bullets. Barr stated that this method of examination is widely accepted in the field of firearms identification.

¶ 25    For this case, Barr received the AR-15 style firearm found in the Mercedes trunk and the bullet recovered from Cassandra's autopsy. He said that the firearm was "an American Tactical brand firearm, model Omni Hybrid *** .223 Remington/5.56 by .45 millimeter." Barr explained that this means the firearm could fire both .223 and 5.56 caliber ammunition. He then test fired .223 caliber ammunition into a water recovery tank. He compared the test fired bullets with the bullet recovered during Cassandra's autopsy using the comparison microscope to determine whether there was "a sufficient agreement of individual characteristics." Based on his comparison, Barr concluded that the bullet recovered from Cassandra's autopsy was fired by the firearm found in the trunk of the Mercedes.

¶ 26    Jeffrey Parise also testified as an expert in firearms identification. Parise said that the State police lab policy required firearm identifications to be verified by a second examiner. He reviewed the evidence, including the bullet recovered during the autopsy and the test shots fired by Barr, following the same methods as Barr. Parise also concluded that the firearm recovered from the Mercedes was the one that fired the bullet recovered during Cassandra's autopsy.

¶ 27    After the State rested, defendant unsuccessfully moved for a directed verdict. Defendant did not call any witnesses.

¶ 28    On February 6, 2025, the jury found defendant guilty of the first-degree murders of Cassandra and Changina. The jury also found that defendant personally discharged the firearm that caused their deaths.

¶ 29    On April 3, 2025, defendant filed a motion for a new trial or judgment of acquittal. Defendant argued, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt. On April 24, 2025, the trial court denied the motion following a hearing.

¶ 30    Also on April 24, 2025, the trial court sentenced defendant to a mandatory term of natural life imprisonment.  730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2024).  Defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32    Defendant's sole argument on appeal is that his trial counsel was ineffective by insufficiently challenging Barr's testimony.  He first contends that his trial counsel was deficient by failing to request a *Frye* hearing.  In support of this argument, defendant cites several research articles regarding the reliability of firearms identification testimony.  The State argues that we should not consider this argument because it relies on facts not in the record.  See *People v. Veach*, 2017 IL 120649, ¶¶ 46-48 (determining that reviewing courts should not consider claims of ineffective assistance on direct appeal if the argument is dependent on facts not in the record).  We disagree with the State.  The cited authorities are not being used by defendant to prove that the firearms testimony was unreliable, but to show that his trial counsel was ineffective for not being aware of the criticisms of such testimony.  Thus, these authorities do not constitute evidence outside the record, and we may consider defendant's argument.  See *People v. McKown*, 226 Ill. 2d 245, 272-75 (2007) (considering scientific articles).

¶ 33    Turning to the merits, under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but also that the defendant suffered prejudice as a result.  *People v. Houston*, 226 Ill. 2d 135, 143 (2007).  Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim.  *Strickland*, 466 U.S. at 687.  When a claim of ineffective

assistance of trial counsel is raised for the first time on appeal, our review is *de novo*. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40.

¶ 34 In Illinois, the *Frye* standard governs the admissibility of scientific evidence, as codified in Illinois Rule of Evidence 702 (eff. Jan. 1. 2011):

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs."

¶ 35 "The *Frye* test is used to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinion is actually invalid.' " *In re Commitment of Bauer*, 2020 IL App (2d) 180905, ¶ 8 (quoting *In re Detention of New*, 2014 IL 116306, ¶ 26). Under *Frye*, scientific evidence is admissible at trial "only if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). "General acceptance" does not mean universal acceptance, and it does not require that the method be accepted by even a majority of experts. *Id.* at 530. Instead, it is sufficient that the methodology underlying the expert's opinion is reasonably relied upon by experts in the field. *Id.*

¶ 36    Significantly, the *Frye* test applies only to scientific methodologies that are "new" or "novel." Generally, a methodology is considered "new" or "novel" if it is "original or striking" or "does 'not resembl[e] something formerly known or used.' " *Id.* (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 79 (2002)). A trial court may determine whether a scientific methodology is generally accepted either by holding an evidentiary hearing or taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. *McKown*, 226 Ill. 2d at 254.

¶ 37    The decision whether to pursue a challenge under *Frye* is a matter of trial strategy. *People v. Gordon*, 378 Ill. App. 3d 626, 639 (2007). "Our supreme court has directed that counsel's strategic decisions made after an investigation of the law and the facts are 'virtually unchallengeable' (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)) or 'virtually unassailable' (*People v. Ramsey*, 239 Ill. 2d 342, 433 (2010))." *People v. Wells*, 2026 IL App (2d) 250045-U, ¶129.[1] Thus, "matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel fails to conduct any meaningful adversarial testing." *Id.* The failure to file a motion seeking a *Frye* hearing does not establish incompetent representation when the motion would have been futile. See *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 38    As defendant acknowledges, our supreme court has held that firearms identification testimony is admissible at trial since at least 1930. See *People v. Fisher*, 340 Ill. 216, 237-41 (1930). Significantly, this court recently twice rejected arguments that a defendant's trial counsel was ineffective for failing to request a *Frye* hearing for firearms identification testimony. See

[1]We may rely on the reasoning of a nonprecedential decision under Illinois Supreme Court Rule 23 (eff. June 3, 2025). *Zhao v. State Farm Fire & Casualty Co.*, 2025 IL App (2d) 240723, ¶ 30; *People v. Ingram*, 2020 IL App (2d) 180353, ¶ 21 n.1.

*Wells*, 2026 IL App (2d) 250045-U, ¶ 138; *People v. Williams*, 2026 IL App (2d) 250113-U, ¶ 138. In those cases, we determined that admission of such testimony without a *Frye* hearing was settled under Illinois law.

¶ 39    For example, in *People v. Robinson*, 2013 IL App (1st) 102476, ¶ 80, the appellate court noted that "expert firearms testimony has been generally admissible in Illinois courts for decades" and that there was no "Illinois case law casting doubt on the general admissibility of such testimony." The court further determined that federal and state courts to consider the issue have "uniformly" concluded that toolmark and firearms identification methodology is generally accepted and admissible at trial and therefore rejected the defendant's argument that the methodology was not generally accepted. *Id.* ¶ 91; see *People v. Dupree*, 2014 IL App (1st) 121179-U, ¶¶ 34-35 (following *Robinson* and rejecting the argument the trial court erred by not conducting a *Frye* hearing).

¶ 40    Similarly, in *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 54, the defendant relied on a 2009 report by the National Research Council of the National Academy of Sciences to argue that the trial court erred in admitting firearm identification evidence without conducting a *Frye* hearing. The defendant claimed that this methodology was "novel" under our supreme court's decision in *McKown*, which held that horizontal gaze nystagmus field sobriety tests were novel because Illinois courts issued "divergent opinions on the topic" such that the general acceptance of the test "remain[ed] unsettled." *Id.* ¶ 58 (quoting *McKown*, 226 Ill. 2d at 257). The *Rodriguez* court distinguished *McKown* because "the law in Illinois is consistent in its admission" of firearms identification testimony. *Id.* at ¶ 61. The court concluded that "[t]oolmark and firearm identification is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*." *Id.* The court also

rejected the defendant's reliance on the 2009 report because "the report's concerns go to the weight and not to the admissibility of such evidence." *Id.* ¶ 62. Therefore, the court affirmed the admission of the firearms identification evidence without a *Frye* hearing. *Id.*; see *People v. Dorsey*, 2025 IL App (1st) 230035-U, ¶¶ 51-53 (rejecting argument that a *Frye* hearing was required for admission of firearms identification evidence because "*Rodriguez* remains good law and we see no reason to depart from it").

¶ 41  Here, defendant argues that several foreign cases and journal articles show that the general acceptance of the firearms identification testimony offered by Barr is unsettled. See *e.g.*, *State v. Adams*, 572 P.3d 291, 313 (Or. Ct. App. 2025) (holding that the prosecution did not carry its burden of showing that the AFTE firearms identification method was scientifically valid); *Abruquah v. State*, 296 A.3d 961, 997 (Md. 2023) (holding that the trial court erred in admitting firearms identification expert testimony because "there was an analytical gap between the type of opinion firearms identification can reliably support and the opinion [the expert] offered"). Defendant's sole Illinois authority is a trial court decision from the circuit court of Cook County, *People v. Kimberley*, No. 22-CR-2932-01 (Cir. Ct. Cook County Jul. 1, 2025). However, that decision does not support defendant's argument about the necessity for a *Frye* hearing on firearms identification testimony. Rather, the trial court excluded the expert testimony under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) because the expert's testimony may have prejudiced or confused the jury based on the specific facts of that case. Indeed, the trial court explicitly stated that the issue in the case "was not about problems with firearms identification evidence generally" and that "the general admissibility of firearm identification testimony is settled law in Illinois."

¶ 42  We therefore reject defendant's argument that the admissibility of firearms identification testimony is unsettled. Courts in Illinois have uniformly held that such testimony is admissible at

trial without a *Frye* hearing because it is not "new" or "novel" and it is generally accepted in the scientific community. Indeed, "[t]he fact there is a dearth of authority upon which he can rely cannot support an argument that, at this point, the admissibility of expert testimony pertaining to firearms and toolmark identification is unsettled." *Wells*, 2026 IL App (2d) 250045-U, ¶ 138. Accordingly, defendant's trial counsel was not ineffective by failing to request a *Frye* hearing for Barr's testimony.

¶ 43 Defendant next argues that his trial counsel was ineffective for failing to object to Barr's opinion based on a purported lack of foundation. Defendant asserts that Barr offered his opinion without any testimony that his opinion stemmed from the general consensus within his field or citation to any professional literature supporting his opinion.

¶ 44 Defendant's argument is without merit. Barr testified about his background, education, training, and experience. He also explained the differences between class and individual characteristics and his use of comparative microscopy to evaluate the ballistics evidence. He explained that this method of evaluation is generally accepted in the scientific community. Barr also testified specifically how he evaluated the evidence in this case to reach his conclusion that the firearm found in defendant's car fired the bullet that was recovered during Cassandra's autopsy.

¶ 45 Further, we addressed this exact argument in *Wells*. There, the defendant argued that his trial counsel was ineffective for failing to object to the State's firearms identification expert based on a lack of foundation. 2026 IL App (2d) 250045-U, ¶ 144. We concluded that any lack of detail in the expert's testimony went to its weight, not its admissibility. *Id.* In doing so, we distinguished *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 72, where we held that the defendant's trial counsel was ineffective for failing to object to the foundation of an expert testifying to the cause and manner of a child's death because the record was unclear as to the reason for the expert's opinion,

- 13 -

he never testified that his opinion was the general consensus in his field, and he did not identify any professional literature supporting his opinion.

¶ 46   Under the circumstances presented here, we agree with *Wells* that any deficiencies in Barr's testimony go to the weight to be given to his testimony, not its admissibility. Unlike *Petrie*, the basis for Barr's testimony is clear and he testified that his opinion and methodology were consistent with the general consensus in his field. Accordingly, defendant's trial counsel was not ineffective for failing to object to Barr's testimony based on a lack of foundation.

¶ 47   Finally, defendant argues that his trial counsel was ineffective for failing to meaningfully challenge Barr on cross-examination. He asserts that his trial counsel fell below an objective standard of reasonableness because he did not educate the jury about the controversies in firearms identification through cross-examination of Barr.

¶ 48   Defendant's argument is again without merit. As explained above, the issue of the reliability and admissibility of firearms identification testimony is settled in Illinois. Thus, we cannot conclude that trial counsel's failure to raise this issue on cross-examination was irrational or objectively unreasonable. See *Wells*, 2026 IL App (2d) 250045-U, ¶ 149 (rejecting argument that trial counsel was ineffective for failing to raise controversies of firearms identification methodology on cross-examination of expert witness because the issue is settled); *Williams*, 2026 IL App (2d) 250113-U, ¶ 143 (same). Accordingly, defendant's trial counsel was not ineffective for failing to cross-examine Barr about purported issues with the reliability of firearms identification testimony.

¶ 49                                    III. CONCLUSION

¶ 50   For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 51   Affirmed.